UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DYSON, INC. and DYSON TECHNOLOGY LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) | 1:14-cv-0779 |
| v. | ) ) ) | |
| | ) | Magistrate Judge Susan E. Cox |
| SHARKNINJA OPERATING LLC and SHARKNINJA SALES COMPANY | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

For the reasons more fully discussed below, the Motion to Compel [244] filed by Defendants SharkNinja Operating LLC and SharkNinja Sales Company (collectively, "Shark") is granted in part and denied in part.

**I.     Background**

For the purposes of the instant motion, the Court assumes familiarity with the background facts in this suit, which were covered in Judge Darrah's Memorandum Opinion and Order denying Defendants' Motion for Summary Judgment of Noninfringement entered on September 2, 2015. (Dkt. 125.) Shark filed the instant motion to compel, seeking to compel responses to Shark's Interrogatories Nos. 10 and 17.

During the pendency of this suit, Plaintiffs Dyson, Inc. and Dyson Technology Limited (collectively, "Dyson") "filed paperwork to correct the inventorship" of two of the design patents at issue in this suit (the "'010 and '823 patents"). (Dkt. 241 at 3.) Dyson had previously alleged that a foreign priority date of August 27, 2010 applied to the '010 and '823 patents, and listed the

1

inventors as Timothy Stickney, James Dyson, and Peter Gammack. (Dkt. 241 at 2-3.) On March 31, 2016, in response to Shark's interrogatories, and more than a year after Dyson's Final Infringement Contentions were filed, Dyson claimed that the '010 and '823 patents had a priority date of March 6, 2006. (Dkt. 244 at 4.) Shark contends these changes are intended to avoid prior art that would render Dyson's patents invalid. (Dkt. 244 at 2.) Dyson asserts that these changes resulted from information gleaned from notebooks and sketches reviewed during the course of discovery. (Dkt. 241 at 7.)

On April 25, 2016, Dyson filed two Requests to Correct Inventorship Under 37 C.F.R. § 1.324 with the United States Patent and Trademark Office ("PTO") that sought to remove Timothy Stickney as a named inventor on the '010 and '823 patents. (Dkt. 244, Exs. 6-7.) Both of these requests included statements from Mr. Stickney, Mr. Gammack, and Mr. Dyson, which read: "I agree to the change of inventorship to delete [Mr. Stickney] as an inventor." (*Id.*) At his deposition, Mr. Dyson testified that he was asked to sign these statements by his attorneys, and that the reason for the change in inventorship was "probably" explained to him by his attorneys before he signed the statement. (Dkt. 244, Ex. 8 at 90:10-91:5.)

Needless to say, Shark feels that it is entitled to additional discovery on inventorship, priority dates, and Dyson's reasoning for changing them years into the instant suit. At issue in the instant motion are Shark's Interrogatory 10 and Interrogatory 17. Interrogatory 10 seeks to have Dyson "identify and describe each Named Inventor's and any other person's contribution to the claimed design . . . including . . . the date(s), location(s), the relevant portion(s) of the claimed design involved, an identification of all witnesses who can corroborate such contribution, and an identification of all documents corroborating such contribution." (Dkt. 244, Ex. 4.) In response, Dyson provided a table with each named inventor, their contribution, and

the location. (*Id.*) The location for all '010 and '823 patents is Malmesbury, Great Britain. (*Id.*) As for the contribution, each entry states "[c]ollective contribution to overall design." (*Id.*)

Interrogatory 17 appears to seek information regarding the decision to remove Timothy Stickney as a named inventor on the '010 and '823 patents. It demands certain information regarding "each and every determination by Dyson of who does or does not qualify as a proper inventor" of the patents in the suit, including "(a) the specific date of each such determination; (b) the complete factual and legal basis for each such determination; (c) each individual involved in making each such determination . . .; (d) all documents considered in making or otherwise relating to each such determination; and (e) all communications relating to each such determination." (Dkt. 244, Ex. 5.) After objecting to the Interrogatory on the basis of attorney-client privilege and the work product doctrine, Dyson responded that "around February and March 2016, Dyson's investigation during discovery in this case revealed that the invention claimed in the '010 and '823 patents was conceived and reduced to practice before Tim Stickney was involved and that he was incorrectly included as an inventor." (*Id.*) In other words, the new priority date alleged by Dyson would make it impossible for Mr. Stickney to have been involved with the conception of the inventions embodied in the '010 and '823 patents. Therefore, the change in inventorship is directly related to Dyson's relatively new claim that priority date is March 6, 2006, not August 27, 2010. Shark has moved for an order compelling Dyson to provide more complete responses to Interrogatory Nos. 10 and 17.

## II. Discussion

### A. Interrogatory 10

Shark moves for this Court to enter an order compelling Dyson to "provide a thorough and detailed response to Interrogatory No. 10" because "Dyson's five-word response is facially

deficient." (Dkt 244 at 9.)  The information sought by Shark is clearly relevant, and Dyson does not argue otherwise.  Section 102(f) of the patent code "mandates that a patent accurately list the correct inventors of a claimed invention," and misjoinder or nonjoinder of inventors will render a patent invalid.  *Pannua v. Iolab Corp.*, 155 F.3d 1344, 1349 (7th Cir. 1998).  "[A] joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed" by their invention, and Section 116 of the patent code "sets no explicit limit on the quantum of quality of inventive contribution required for a person to qualify as a joint inventor."  *Fina Oil and Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997).  "However, a joint inventor must contribute in some significant manner to the conception of the invention," and each joint inventor "must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice."  *Id.*  Thus, if Shark can prove that James Dyson or Petter Gamack did not meet the necessary quantum of contribution to be named a co-inventor on the '010 or '823 patents (*i.e.*, misjoinder), or that Tim Stickney or some other Dyson employee was not named as a co-inventor despite having contributed in a way that would qualify them to be so named (*i.e.*, nonjoinder), the patents will be rendered invalid.

According to Shark, it "is entitled to know the factual basis for Dyson's contention that Mssrs. Dyson and Gammack, and only those two, jointly conceived the claimed designs," and "it would be fundamentally unfair to permit Dyson to dramatically change its invention story without being required to provide the facts that allegedly support its new theories."  (Dkt. 244 at 9.)  However, Shark's argument presupposes that the only manner of uncovering the "facts" or the "factual basis" underlying Dyson's decisions and theories is through interrogatory responses. In its brief in response to the instant motion, Dyson notes that it has produced scores of laboratory notebooks, emails from several Dyson employees (including James Dyson and Peter

4

Gammack), and its patent prosecution files, among other materials. (Dkt. 241 at 8.) Additionally, at the time the motion was filed, Shark had had the opportunity to take the depositions of James Dyson and Peter Gammack,[1] and several additional Dyson employees. In other words, Shark is not being denied any facts.

Although Shark may not like the answer it received to this interrogatory, this Court does not believe that Dyson's response to Interrogatory Number 10 is obscuring facts related to inventorship from Shark, or that the response in inaccurate. The testimony in the case suggests that Mr. Dyson and others cannot recall who contributed what during the invention process, and Dyson's response to Interrogatory Number 10 is consistent with that testimony. Other courts have recognized that precise recollection of each individual's contribution to a design may be difficult to come by when an invention is created in a group setting. *See Canon Comp. Sys. Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). None of the cases that Shark cites stand for the proposition that a party must articulate with exacting detail each co-inventor's contribution in an interrogatory response, and the Court does not believe that such a response is required. Moreover, to the extent that Mr. Dyson or any other witness produced by Dyson is unable to provide a coherent, consistent version of how the designs underlying the '010 and '823 patents were created at trial, that failure is just as likely to cut in favor of Shark's potential invalidity defenses (*i.e.*, by tending to prove that the inventors themselves have no recollection as to their supposed contributions, which is indicative of misjoinder) as it is to prevent Shark from proving those defenses. Therefore, the motion is denied as to Interrogatory Number 10.

**B.     Interrogatory 17**

Shark makes two arguments related to Interrogatory Number 17: 1) the "underlying

---

[1] Mr. Dyson's deposition took place after the Request to Correct Inventorship had been filed, and Shark had ample opportunity question Mr. Dyson on the issues raised by Interrogatory Number 10.

5

technical facts provided for use in preparing submissions to the Patent Office" are not protected by attorney-client privilege or the work product doctrine, and 2) Dyson waived any claim to attorney-client privilege or the work product doctrine "by petitioning the Patent Office to change inventorship of the asserted patents and relying on the supporting inventor declarations of Mr. Dyson." (Dkt. 244 at 10-11.) The Court believes that Dyson has waived the attorney-client privilege as it relates to issues of inventorship over the '010 and '823 patents for the period of time between February 1, 2016 (when Dyson claims to have discovered that its priority date March 6, 2006, thereby necessitating the inventorship change) and April 21, 2016 (the date of Mr. Dyson's statement before the PTO).

Controlling Federal Circuit precedent holds that a party puts its attorney's advice "at issue" in a case – and waives its rights to assert the attorney-client privilege – when it relies on a statement based on the advice of an attorney in an effort to obtain a certificate of correction, and the party uses that certificate of correction to prove issues related to enforceability in a patent suit.[2] In *Winbond Electronics Corp. v. International Trade Commission*, 262 F.3d 1363, 1368 (Fed. Cir. 2001), the patent owner filed a complaint with the International Trade Commission ("ITC") alleging that the defendants had violated the Tariff Act of 1930 by importing and selling products that infringed on the relevant patent. The defendants argued that the patent was invalid for nonjoinder because the patent failed to list an engineer who qualified as a co-inventor. *Id.* Following a hearing, the administrative law judge ("ALJ") "concluded that an incorrect listing of inventors prevented enforcement" of the patent; the ITC upheld the ALJ's opinion. *Id.* The month after the ITC's decision, the patent holder petitioned the PTO to add the missing engineer as an inventor on the patent. *Id.* at 1368-69. The petition included a statement from the engineer

---

[2] The law of the Federal Circuit is controlling here because the issue of inventorship and priority dates are substantive patent law issues. *In re Method of Processing Ethanol Byproducts*, 2014 WL 2938183, at *1 (S.D. Ind. June 30, 2014).

6

that: "the standard for inventorship as it relates to the '903 patent has been explained to me. Based on my understanding of that standard, I hereby state that I have made an inventive contribution to the subject matter claimed in the '903 patent, whereby I am a co-inventor of the claimed subject matter of the '903 patent." *In re Certain Eprom, Eeprom, Flash Memory, and Flash Microcontroller Semiconductor Devices, and Products Containing Same*, USITC Inv. No. 337-TA-395, USITC Pub. No. 3392, 2001 WL 242553, at *9 (Oct. 16, 2000). The petition was granted, and the patent owner sought a rehearing before the ITC on the issue of proper inventorship; the ITC remanded the case to the ALJ, who ordered the patent holder "to produce attorney-client privileged and work product protected documents concerning the inventors" of the patent. *Winbond*, 262 F.3d at 1369. On review of the ALJ's second decision, the ITC determined that the patent holder "placed at issue the advice of counsel by its affirmative act of petitioning the Commission for reconsideration of the inventorship issue based on a certificate of correction . . . issued by the PTO." *Id.* On appeal, the Federal Circuit affirmed the ITC's decision on the issue of waiver.

In this case, Dyson filed two Requests to Correct Inventorship Under 37 C.F.R. § 1.324, each of which included statements from Mr. Stickney, Mr. Gammack, and Mr. Dyson. The statements all state: "I agree to the change of inventorship to delete [Mr. Stickney] as an inventor."[3] At his deposition, Mr. Dyson testified that he did not recall the precise conversation

---

[3] Dyson argues that it has not waived the privilege because Mr. Dyson's statement does not specifically divulge any privileged information. A similar argument was raised and rejected in *Winbond* before the ITC. In relevant part, that decision states: "Atmel does not seriously dispute that the explanation referred to in Gupta's statement to the PTO was given by counsel. Rather, Atmel contends that because Gupta's statement to the PTO did not specifically state that he was relying on counsel's advice, it did not place that advice in issue. We are not persuaded by Atmel's argument that particular language is necessary to place counsel's advice at issue. The circumstances of this case allow for no interpretation other than that Gupta relied on the advice of counsel in coming to his conclusion that he was an inventor of the '903 patent. In deposition testimony taken in related district court litigation between Atmel and Macronix, Gupta expressly admitted that his statement to the PTO, as well as his change of position on the inventorship issue, was based solely on his reliance on advice provided by Atmel's attorneys." *In re Certain Eprom,*

with his attorneys, but that the explanation for the change in inventorship was "probably" explained to him by his attorneys before he signed the statement. Put another way, the reason that Mr. Dyson "agree[d]" to the change of inventorship was his attorneys' explanation. Although the statement in *Winbond* explicitly stated that inventorship standard had been "explained" to the engineer (presumably by his attorneys), the Court believes that the one-degree of removal in the instant suit is a distinction without a difference. There is no meaningful difference between stating that an attorney has "explained" the inventorship standard and stating that you "agree" with an attorney's conclusion that an co-inventor did not meet the legal threshold necessary to be a named inventor on a patent.

Like the patent holder in *Winbond*, Dyson has placed the advice of counsel at issue by petitioning the PTO to correct the inventors of the '010 and '823 patents during the pendency of a law suit that Dyson initiated to enforce its rights under those patents. The change of inventorship was precipitated by the new priority date that Dyson is now claiming, and may have drastic effects on the enforceability of the '010 and '823 patents. As such, it has waived its protections under the attorney-client privilege or the work product doctrine. As noted above, the scope of that waiver is limited to the subject matter and temporal scope implicated by Dyson's attempt to change the inventors on the relevant patents. Therefore, the Court finds that the privilege is only waived on the issue of inventorship and only between February 1, 2016, and April 21, 2016.

Dyson argues that *Winbond* is not applicable to this case because the declaration to correct inventorship in that case was submitted at a time when 35 U.S.C. § 256 "required the patent owner to prove that the inventorship error 'arose without any deceptive intent' by the

---

*Eeprom, Flash Memory, and Flash Microcontroller Semiconductor Devices, and Products Containing Same*, 2001 WL 242553, at *13.

patent owner." (Dkt. 241 at 13.)  The Court does not see why the change in law is relevant to the issue of waiver, and Dyson does not offer an explanation on this front.  Neither the ITC nor the Federal Circuit based their opinion on the deceptive intent issue; the crucial issue in *Winbold* was that the petition sought to correct inventorship, which is a legal issue, based on the advice of counsel, and that the patent holder had put that advice of counsel at issue in the case by seeking to argue enforceability of the patent based on the corrected inventorship.

The case cited by Dyson also does not support its position.  *See in re Method of Processing Ethanol Byproducts*, 2014 WL 2938183, at *3-4 (S.D. Ind. June 30, 2014). Dyson selectively quotes and highlights language regarding good faith dealings with the PTO and argues that those passages are evidence that courts "have recognized that [*Winbond*] applies only to express waiver and reliance on advice of counsel."  First, the *Ethanol Byproducts* case concerned waiver in the context of disclosures to the PTO in the prosecution of a patent, not in the context of seeking a correction of inventorship.  This is important because consulting with an attorney to determine what is disclosed to the PTO in the initial patent prosecution is "nothing more than a routine state of affairs for every patent prosecution client who is represented by an attorney before the PTO."  *Id.* at *3.  Conversely, deleting a co-inventor from a patent is not a routine state of affairs, and submitting a statement to the PTO based on advice of counsel regarding inventorship in order to change the priority of a patent that is the subject of a several-years-old patent law suit it is substantively different than the factual scenario in *Ethanol Byproducts*.

Furthermore, this Court disagrees with the description of *Winbond* in the *Ethanol Byproducts* case that "the client had voluntarily used the fact and content of his attorney's advice to explain away the alleged inequitable conduct before the PTO."  *Id.*  That statement conflates

9

the two issues; a review of the ITC's decision in *Winbond* demonstrates that the issues of inequitable conduct and waiver were separate issues. *See In re Certain Eprom, Eeprom, Flash Memory, and Flash Microcontroller Semiconductor Devices, and Products Containing Same*, 2001 WL 242553, at *14 ("Our decision to find waiver is not based simply on the fact that Amtel's attorneys explained the inventorship issue to Gupta and Gupta acted upon that explanation. . . or the fact that inequitable conduct on the part of Amtel was alleged"). The ITC found that the patent holder had waived the attorney-client privilege by relying on the certificate of correction and the underlying engineer statement (which was based on advice of counsel) in an attempt to have the ITC reconsider the enforceability of the patent. *Id.* at *14. Dyson is engaging in similar activity here. Dyson's change of inventorship is borne from its claim that it has discovered a newer, earlier priority date for the '010 and '823 patents. As such, Dyson is taking affirmative steps that have changed its allegations in the instant suit, which were based on the advice of counsel, thereby putting that advice "at issue." This case fits squarely within the principles articulated by *Winbond*, and this Court sees no compelling reason to depart from that ruling. Dyson has waived attorney client privilege over the issue of inventorship for communications between February 1, 2016, and April 11, 2016, and is ordered to respond fully to Interrogatory Number 17.[4]

## CONCLUSION

For the reasons more fully discussed above, the Motion to Compel [244] filed by Defendants Shark is granted in part and denied in part. The motion is denied as to Interrogatory

---

[4] The Court also notes that much of the information requested in Interrogatory Number 17 would not be privileged in any event. For example, simply identifying the factual and legal basis for its determination regarding inventorship does not require Dyson to divulge privileged communications. Likewise, naming the individuals involved in making the determination (even if some are lawyers) does not impinge on any privilege. Nor would listing the documents considered call for privileged information, any documents are that are privileged can be identified and listed on Dyson's privilege log without requiring their production. Dyson should be sure to provide a complete answer to Interrogatory Number 17 that includes this non-privileged information as well.

Number 10, and granted as to Interrogatory Number 17.

**ENTERED:**

**DATED:** <u>September 28, 2016</u>

                                                                  Susan E. Cox
                                                                  United States Magistrate Judge